UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 18-0105 (PLF) |
| | ) | |
| SAMIRA JABR, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION

   This matter is before the Court on defendant Samira Jabr's motion for judgment
of acquittal under Rule 29 of the Federal Rules of Criminal Procedure or, in the alternative, for
acquittal by the Court after a bench trial in which Ms. Jabr was prosecuted for entering or
remaining in a restricted building or grounds in violation of 18 U.S.C. § 1752(a)(1).  Upon
careful consideration of the trial record, the legal arguments presented by counsel at a motions
hearing at the close of the government's case, and their written briefs on the matter, the Court
will grant the motion for judgment on the substantive charge, but deny it insofar as Ms. Jabr also
seeks judgment on the charge of attempt under the statute.  Furthermore, as the factfinder and
considering all of the evidence, the Court finds that the government has carried its burden to

prove Ms. Jabr guilty beyond a reasonable doubt of attempting to violate the statute. It therefore finds her guilty of attempt to violate 18 U.S.C. § 1752(a)(1).[1]

## I. BACKGROUND

This is a White House fence-jumper case. But Ms. Jabr did not actually gain entry to the White House or its surrounding lawns on April 20, 2018. Instead, she was arrested on the steps of the U.S. Treasury Building. Within days after Ms. Jabr's arrest on the Treasury grounds, the United States filed a one-count information charging her with the misdemeanor of "knowingly enter[ing] and remain[ing] in a restricted building and grounds, that is, the White House Complex and United States Department of Treasury Building and Grounds, without lawful authority to do so," in violation of 18 U.S.C. § 1752(a)(1). See Information. Ms. Jabr subsequently waived her right to a jury trial and requested a non-jury trial. See Waiver of Trial by Jury and Request for Nonjury Trial [Dkt. No. 17]. Trial before the Court began on August 14, 2018. The government put on its case, calling four witnesses and submitting 13 exhibits,

---

[1]     In connection with the pending motion under Rule 29, the Court has reviewed the following materials: the Information [Dkt. No. 4]; Defendant's Motion for Judgment of Acquittal ("Def. Mot.") [Dkt. No. 23]; Government's Opposition to Defendant's Motion for Judgment of Acquittal ("Opp.") [Dkt. No. 26]; Defendant's Reply to the Government's Opposition ("Reply") [Dkt. No. 28]; Government's Surreply ("Surreply") [Dkt. No. 29]; Trial Transcript of August 14, 2018 ("Trans. 1") [Dkt. No. 24]; Trial Transcript of August 15, 2018 ("Trans. 2") [Dkt. No. 25]; and Motions Hearing Transcript of September 13, 2018 ("Trans. Mot. H.") [Dkt. No. 30]. The Court has also reviewed the government's trial exhibits, including: Security Footage 1057 ("Sec. 1057") [Gov. Ex. 1-A]; Security Footage 1058 ("Sec. 1058") [Trial Ex. 1-B]; Security Footage 1059 ("Sec. 1059") [Gov. Ex. 1-C]; Security Footage 1061 ("Sec. 1061") [Gov. Ex. 1-D]; Security Footage 1070 ("Sec. 1070") [Gov. Ex. 1-E]; Security Footage 1709 ("Sec. 1709") [Gov. Ex. 1-F]; and Security Footage 1710 ("Sec. 1710") [Gov. Ex. 1-G]. After her arrest, Ms. Jabr gave an interview to two United States Secret Service agents, William Rose and Clay McDonald. Special Agent Rose testified about the interview, and two excerpts from the interview were subsequently played for the Court to hear during the bench trial. The CD that held the recordings was admitted in evidence as Exhibit 2. See Interview 1 [Gov. Ex. 2-A]; Interview 2 [Gov. Ex. 2-B].

including seven different segments of security camera footage [Gov. Ex. 1] and two excerpts

from Ms. Jabr's post-arrest interview with two United States Secret Service agents, Special

Agents Rose and McDonald [Gov. Ex. 2].

At the conclusion of the government's case, counsel for Ms. Jabr orally moved for

judgment of acquittal under Rule 29 of the Federal Rules of Criminal Procedure. See Trans. 1 at

89.  Defense counsel filed a written memorandum in support of the motion the following day

[Dkt. No. 23], and the Court heard preliminary arguments from counsel for both parties.

Thereafter, the government filed a written opposition to the motion [Dkt. No. 26]; Ms. Jabr filed

a reply [Dkt. No. 28] in support of her motion, and the government filed a surreply [Dkt. No. 29].

The Court heard argument on the Rule 29 motion on September 13, 2018.  After a colloquy with

the Court concerning her rights, Ms. Jabr relayed her decision not to testify; her counsel said that

they had no witnesses, and the defense rested its case. See Trans. Mot. H. at 41-43.  Because

both sides had rested and the evidence was closed, by stipulation of the parties, the Court agreed

to consider their arguments on September 13, 2018 as both their argument on the Rule 29 motion

and their closing arguments after trial. See id. at 43-44.

## II.  THE BENCH TRIAL

The genesis of Ms. Jabr's story begins in California. See Interview 1 at 10:01.

Ms. Jabr drove from California to Washington, D.C., stopping at three different casinos. See id.

at 10:14-26:43.  Over the course of those visits, she became suspicious that she had uncovered a

conspiracy between the casinos and law enforcement and grew terrified that police officers

wanted to kill her because she had unearthed this collusion. See id. at 26:43-27:16; 29:35-32:26;

Interview 2 at 00:05-00:20.  In a recorded post-arrest interview, she explained that she traveled

to Washington, D.C. because she wanted to speak with President Trump to "let him know what's going on." See Interview 1 at 30:02-30:06; 31:20-31:40.

Upon arriving in Washington, D.C., Ms. Jabr first visited the Capitol. Officer Karl Haggins of the United States Capitol Police testified that Ms. Jabr entered the Hart Senate Office Building on April 20, 2018 at around 3:30 p.m. See Trans. 1 at 23-25. According to Officer Haggins, Ms. Jabr approached the officers stationed at the entrance to the Hart Building and explained that she was "cheated" by a casino in California and another casino during her trip to D.C. See id. at 25. Ms. Jabr rejected Officer Haggin's suggestion that she speak with her Senator or Representative, became visibly upset, and left the Hart Office Building. See id. at 26-28. After her interaction with the U.S. Capitol Police, Ms. Jabr explained: "I'm like I gotta talk to Trump like right now, like let him know what's going on. So I run to the White House, which I find out, I didn't even go to the White House. But I was just trying to get his attention." See Interview 1 at 30:02-30:15 (statement by Agent Rose omitted).

Footage from security cameras stationed around the U.S. Treasury Building show that at or about 5:30 p.m. on April 20, 2018, Ms. Jabr parked her car on 15th Street, NW. See Sec. 1070. She walked up to the eastern perimeter of the U.S. Treasury Department on 15th Street, NW and scaled the black wrought-iron fence that lines the public sidewalk. See Sec. 1710. She ran across the southeast courtyard – a small grass enclosure within the wrought-iron fence, next to the 15th Street, NW sidewalk – visibly ducking her head. See Sec. 1058; Sec. 1709. She explained that she "saw a cop car parked . . . that's why . . . [she] just stayed low." See Interview 2 at 00:50 – 01:02. After crossing the southeast courtyard, she jumped over another, shorter wrought-iron fence that was about the height of her waist and locked with a padlock. See Sec. 1709; Sec. 1057; Gov. Exs. 9 & 10. Reaching a plateau – the "center

staircase" – she continued to run up the stairs on the southern side of the U.S. Treasury Building. See Sec. 1059; Sec. 1709; Trans. 1 at 58. Ms. Jabr reached the top of those stairs, arriving at the southern wall of the U.S. Treasury Building where the door was locked. See Trans. 1 at 45; Gov. Exs. 7 & 8. Armed Secret Service officers chased Ms. Jabr to the top of the U.S. Treasury stairs, see Sec. 1709; Sec. 1710; Sec. 1059, and there she was held at gunpoint, handcuffed, and placed under arrest. See Trans. 1 at 46, 61-63, 70-73.

Sergeant Michael Delcoco of the United States Secret Service testified at trial. At the time of Ms. Jabr's arrest, he was stationed at the Joint Operations Center, tasked with monitoring radios and cameras of the White House complex. He explained that the Secret Service was advised of an alarm break on the south side of the U.S. Treasury and "elevated [its] condition." See Trans. 1 at 30, 33. Officer Michael Ciocco of the Secret Service – the first officer to reach Ms. Jabr at the top of the U.S. Treasury steps – testified that there was no evidence to suggest that Ms. Jabr was armed or that she made any threats. See id. at 75. According to Officer Ciocco, Ms. Jabr complied with the officers' orders after temporarily "freezing." See id. at 72.

Following her arrest, Ms. Jabr was given Miranda warnings – which she waived – and then was interviewed by Special Agent William Rose and his partner, Special Agent Clay McDonald, of the United States Secret Service. See Trans. 1 at 78-79. The recordings of that interview were admitted as evidence during trial. During that interview, Ms. Jabr explained that she "knew that nobody was supposed to go up there, but," referring to the place of her arrest, "[she] was terrified that these cops were going to try to kill [her], that [she] just thought that even if this doesn't work, they're going to take [her] to jail or they're going to take [her] to somewhere where no one can harm [her]." See Interview 2 at 00:01-00:18. She said that when

she arrived, she saw the gates and thought "You can't go in?".  See Interview 1 at 30:19-30:22.

When asked by Special Agent McDonald why she jumped over the fence from 15th Street, Ms.

Jabr explained that "[she] was hoping that if [she] could run inside, that [she] could at least get

someone's attention.  [She] figured that even if you guys arrested [her], that [she] would be

safe."  See id. at 31:05-31:18.

      The U.S. Treasury Building is located to the east of the White House.  It is

bordered to the north by Pennsylvania Avenue; to the east by 15th Street, NW; to the west by the

White House grounds; and to the south, by Hamilton Place or Street, which is restricted by a

vehicle entry gate.  See Sec. 1710; Trans. 1 at 31, 41-42, 47; Gov. Ex. 12.  Pictures of the

southeast courtyard of the Treasury Building at the time of Ms. Jabr's arrest that were admitted

in evidence show bike racks blocking pedestrians from entering Hamilton Place or Street.  See

Gov. Ex. 5; Trans. 1 at 68.  On the bike racks, there is a small sign that states "Restricted Area.

Do Not Enter."  See Gov. Ex. 5, 11.  No other signage is viewable in the pictures or security

footage submitted as evidence.

      In speaking with the Secret Service agents following her arrest, Ms. Jabr

explained that she was unaware that she was attempting to enter the Treasury Building, and not

the White House:

| | |
|---|---|
| Agent Rose: | "Did you know that that was the Treasury Building, and not the White House?" |
| Ms. Jabr: | "No, the female cop told me, she's like 'But you know that's not the White House, right?' and I was like, well I feel silly now." |
| Agent McDonald: | "Did you see the White House at all before?" |
| [. . .] | |
| Ms. Jabr: | "I'm an idiot, it's white and circle, right?" |

[. . .]

Agent Rose:       "The White House is on Pennsylvania Avenue,
                  which is around the corner."

Ms. Jabr:         "I GPS'ed it. And so . . . it said that 'you arrived,'
                  and so I got out of the car."

See Interview 2 at 1:17-1:50 (statements and clarifying questions by agents omitted).

### III. LEGAL STANDARD

Rule 29(a) of the Federal Rules of Criminal Procedure provides that "[a]fter the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." FED. R. CRIM. P. 29(a).  When ruling on a motion for judgment of acquittal, the Court must "consider[] the evidence in the light most favorable to the government and determin[e] whether, so read, it is sufficient to permit a rational trier of fact to find all of the essential elements of the crime beyond a reasonable doubt." See United States v. Kayode, 254 F.3d 204, 212-13 (D.C. Cir. 2001) (quoting United States v. Harrington, 108 F.3d 1460, 1464 (D.C. Cir. 1997)); United States v. Safavian, 644 F. Supp. 2d 1, 7-8 (D.D.C. 2009); United States v. Duran, 884 F. Supp. 577, 583 (D.D.C. 1995), aff'd, 96 F.3d 1495 (D.C. Cir. 1996).  The Court must "accord[] the government the benefit of all legitimate inferences," see United States v. Weisz, 718 F.2d 413, 437 (D.C. Cir. 1983), cert. denied 104 S. Ct. 1285 (1984), and deny the motion if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." See United States v. Arrington, 309 F.3d 40, 48 (D.C. Cir. 2002) (emphasis in original) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)).  Put another way, the Court may grant a motion for judgment of acquittal only when "a reasonable juror must necessarily have had a reasonable doubt as to the defendant[']s guilt." See United States v. Weisz, 718 F.2d

at 437 (emphasis in original) (citing United States v. Singleton, 702 F.2d 1159, 1162-63 (D.C. Cir. 1983)).  See also United States v. Reese, 561 F.2d 894, 898 (D.C. Cir. 1977); Curley v. United States, 160 F.2d 229, 232-33 (D.C. Cir. 1947) ("[I]f there is no evidence upon which a reasonable mind might fairly conclude guilt beyond reasonable doubt, the motion [for judgment of acquittal] must be granted."), cert. denied, 331 U.S. 837 (1947).

      The same standard guides a district court in resolving a Rule 29 motion whether in the context of a bench or jury trial.[2]  While the text of Rule 29 refers only to the procedure to follow in a jury trial, see FED. R. CRIM. P. 29, courts generally have applied the same legal standard in bench trials.  See, e.g., United States v. Salman, 378 F.3d 1266, 1267 n.3 (11th Cir. 2004); United States v. Doe, 136 F.3d 631, 636 (9th Cir. 1998) ("The same test applies to both jury and bench trials.").  In addition, Rule 29 provides that the same sufficiency of the evidence standard applies whether the court decides a motion for judgment of acquittal at the close of the government's case or at the close of all the evidence.  See FED. R. CRIM. P. 29(a); see also 2A CHARLES ALAN WRIGHT & PETER J. HENNING, FEDERAL PRACTICE & PROCEDURE CRIMINAL § 467 (4th ed. 2019).

      Further, viewing the evidence in the light most favorable to the government at this stage does not – as Ms. Jabr argues, see Trans. Mot. H. at 6-8 – impermissibly shift the burden of proof to the defense.  As Judge Revercomb explained, at the moment of deciding a motion for judgment of acquittal, "this Court is not the trier of fact."  See United States v. Recognition Equip., Inc., 725 F. Supp. 587, 588 n.1 (D.D.C. 1989).  The Court is not stepping into the shoes of the jury to assess the defendants' guilt or to make any findings about the credibility of

---

[2]     Ms. Jabr argues that in resolving a Rule 29 motion in a bench trial, the Court must view the evidence as the jury would at the conclusion of the trial – there must be proof beyond a reasonable doubt – but there is no support for her position in the case law.

witnesses, but rather, is "simply applying a legal standard to the government's evidence." <u>See</u>
<u>id</u>. If this Court were to deny Ms. Jabr's motion for judgment of acquittal, it would only then
move on to assume its role as factfinder to "determine credibility, weigh the evidence, and draw
justifiable inferences of fact." <u>See</u> <u>United States v. Treadwell</u>, 760 F.2d 327, 333 (D.C. Cir.
1985); <u>see also</u> <u>United States v. Recognition Equipment Inc.</u>, 725 F. Supp. at 588 n.1; <u>United</u>
<u>States v. Khanu</u>, 675 F. Supp. 2d 55, 60 (D.D.C. 2009); Trans. Mot. H. at 39-40.  <u>But</u> <u>see</u> <u>United</u>
<u>States v. Atkinson</u>, 990 F.2d 501, 503 (9th Cir. 1993) ("In a bench trial, the judge acting as the
trier of both fact and law implicitly rules on the sufficiency of the evidence in rendering a verdict
of guilty.  A motion to acquit is superfluous because the plea of not guilty has brought the
question of the sufficiency of the evidence to the court's attention.").[3]

In sum, to resolve Ms. Jabr's Rule 29 motion, the Court must consider the
evidence in the light most favorable to the government – bench trial notwithstanding.  <u>See</u>, <u>e.g.</u>,
<u>United States v. Recognition Equipment, Inc.</u>, 725 F. Supp. at 588 n.1; <u>United States v.</u>
<u>Magallon-Jimenez</u>, 219 F.3d 1109, 1112 (9th Cir. 2000).  "If the evidence reasonably permits a
verdict of acquittal or a verdict of guilt, the decision is for the [factfinder] to make," and the
motion must be denied.  <u>See</u> <u>United States v. Jemal</u>, Criminal No. 05-0359, 2007 WL 778623, at
*3 (D.D.C. March 12, 2007) (quoting <u>United States v. Sutton</u>, 801 F.2d 1346, 1358 (D.C. Cir.

---

[3]      Ms. Jabr also argued at the motions hearing that "there is case law and other
literature suggesting that Rule 29 is not even really the proper rule to apply to a bench trial, that
really Rule 23 controls."  <u>See</u> Trans. Mot. H. at 10.  But Ms. Jabr has not provided any case law
or literature to support that assertion.  Rule 23(c) of the Federal Rules of Criminal Procedure
provides only:  "In a case tried without a jury, the court must find the defendant guilty or not
guilty."  <u>See</u> FED. R. CRIM. P. 23(c).  The Court does not see any reason why Rule 23 cannot be
read consistently with Rule 29.  As discussed, Rule 29 governs the issue of whether Ms. Jabr is
entitled to judgment of acquittal as a matter of law, while Rule 23 would substantiate the Court's
authority to rule as the finder of fact at the culmination of the bench trial should it deny Ms.
Jabr's motion.

1986)).  Only then must the government be held to its higher burden of proof – proof beyond a reasonable doubt.

## IV. DISCUSSION

### A. Subject Matter Jurisdiction

As a preliminary matter, Ms. Jabr argues that the Court lacks subject matter jurisdiction.[4]  Ms. Jabr's jurisdictional argument is premised on the idea that "the information filed by the government states nothing more than a local D.C. Code offense."  See Reply at 2. The core of Ms. Jabr's defense – which will be explained in full infra at 13 – is that she did not enter the area restricted under the terms of the federal statute: "The areas named in [her charging] information are not within the specific Congressional definition."  See id. at 3.  As a result, it is Ms. Jabr's contention that any trespassing charges against her should have been brought pursuant to local District of Columbia Code trespassing statute in the Superior Court of the District of Columbia.  See id. at 3.  The government responds that jurisdiction is proper here and that Ms. Jabr's argument shows a "misreading of the information and a misunderstanding of the concept of subject matter jurisdiction."  See Surreply at 3.  According to the government, the "request for dismissal must be denied because the information charges an offense against the laws of the United States (18 U.S.C. Section 1752); the jurisdictional inquiry ends there."  See id.  The Court agrees.[5]

---

[4]	It appears that Ms. Jabr made a strategic decision not to file a pretrial motion to dismiss the information because she wanted jeopardy to attach before raising the issues resolved in this Opinion.  See Trans. Mot. H. at 29-30.

[5]	To the extent that Ms. Jabr is arguing that the information is defective, the government refutes that argument, as well.  See Surreply at 4.  Ms. Jabr does not reference the sufficiency of the charging document, and the Court therefore need not reach this question.

Federal district courts have "original jurisdiction . . . of all offenses against the laws of the United States." See 18 U.S.C. § 3231. Here, the government has charged Ms. Jabr under 18 U.S.C. § 1752, a federal statute. The fact that the charging document alleges a violation of federal law is enough to establish subject matter jurisdiction. See United States v. Fahnbulleh, 752 F.3d 470, 476 (D.C. Cir. 2014) ("If an indictment or information alleges the violation of a crime set out in Title 18 or in one of the other statutes defining federal crimes, that is the end of the jurisdictional inquiry." (quoting United States v. George, 676 F.3d 249, 259 (1st Cir. 2012))). And even if the Court agrees with Ms. Jabr that the government has failed to make its case under the terms of the statute under which she has been charged, "[a] claim that an element of the offense is unsatisfied . . . goes only to a defendant's guilt or innocence . . . . [J]urisdiction hinges not on the merits, but rather on the court's constitutional or statutory power to adjudicate the case." See United States v. Straker, 800 F.3d 570, 584 (D.C. Cir. 2015) (per curiam). See also Lamar v. United States, 240 U.S. 60, 65 (1916) ("[N]othing can be clearer than that the district court, which has jurisdiction of all crimes cognizable under the authority of the United States . . . , acts equally within its jurisdiction whether it decides a man to be guilty or innocent under the criminal law, and whether its decision is right or wrong.").

Ms. Jabr's reliance on United States v. Koritko is misplaced because that case concerned a superseding information that contained only charges of D.C. Code violations. See Reply at 3; United States v. Koritko, 870 F.2d 738 (D.C. Cir. 1989). There, the D.C. Circuit held that the district court did not have jurisdiction because the government did not properly join the local and federal offenses, "a necessary prerequisite to proceeding with trial in federal court upon

11

any local charge." See United States v. Koritko, 870 F.2d at 739. Here, the sole charge is federal, and the Court therefore has subject matter jurisdiction. See Information.[6]

B. *Sufficiency of the Evidence to Prove a Substantive Violation of Section 1752: Did Ms. Jabr Knowingly Enter a Restricted Building or Grounds?*

Section 1752 criminalizes certain behaviors in or close proximity to a "restricted building[] or ground[]," including trespass, disorderly conduct, and violence. See 18 U.S.C. § 1752(a). By its express language, the statute defines the terms "restricted buildings or grounds" as "any posted, cordoned off, or otherwise restricted area": "(A) of the White House or its grounds, or the Vice President's official residence or its grounds; (B) of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting; or (C) of a building or grounds so restricted in conjunction with an event designated as a special event of national significance." See 18 U.S.C. § 1752(c)(1)(A)-(C).

Here, Ms. Jabr has been charged with violating Section 1752(a)(1), which specifically criminalizes "[w]hoever . . . knowingly enters or remains in any restricted building or grounds without lawful authority to do so." See 18 U.S.C. § 1752(a)(1). As the government acknowledges, the "restricted buildings or grounds" for purposes of Ms. Jabr's case are defined by the statute as "any posted, cordoned off, or otherwise restricted area . . . of the White House or its grounds." See 18 U.S.C. § 1752(c)(1)(A); Trans. 1 at 22. To find Ms. Jabr guilty of violating Section 1752(a)(1), therefore, the Court must find that she "[1] knowingly enter[ed] or

---

[6]        Section 11-502 of the District of Columbia Code provides that the United States District Court for the District of Columbia has jurisdiction over any offense under any law applicable exclusively to the District of Columbia so long as the D.C. Code offense "is joined in the same information or indictment with any Federal offense." D.C. Code § 11-502(3). See also United States v. Malenya, 736 F.3d 554 (D.C. Cir. 2013); United States v. McLaughlin, 164 F.3d 1 (D.C. Cir. 1998). But it does not give this Court jurisdiction over indictments or informations containing only D.C. Code offenses. See United States v. Koritko, 870 F.2d at 739.

remain[ed] in" "[2] any posted, cordoned off, or otherwise restricted area . . . of the White House or its grounds" "[3] without lawful authority to do so." <u>See</u> 18 U.S.C. §§ 1752(a)(1), (c)(1)(A). The Court must determine whether the government presented sufficient evidence such that a rational factfinder could find those elements proven beyond a reasonable doubt.

          1.  The Second Element of Section 1752(a)(1)

        Ms. Jabr argues that the Court must grant judgment of acquittal because the government has failed to prove that she entered a "restricted building or grounds" – that is, any "posted, cordoned off, or otherwise restricted area . . . of the White House or its grounds." <u>See</u> 18 U.S.C. § 1752(c)(1)(A); Def. Mot. at 2.[7]  Ms. Jabr agrees that the government's evidence shows that she "hopped over a small fence on the southeast lawn of the U.S. Treasury Department building and a small gate on the southeast steps of that building." <u>See</u> Def. Mot. at 2.  It is her contention, however, that the U.S. Treasury Department and its southeast lawn – the only area that Ms. Jabr entered – do not qualify as a "restricted building[] or grounds" "under the plain text and meaning of the statute because they are not part of the 'White House grounds.'" <u>See</u> <u>id</u>. at 2-3.  She therefore moves for judgment of acquittal because the "government's evidence is insufficient to sustain a conviction." <u>See</u> <u>id</u>. at 1.

        The information filed by the government alleges that Ms. Jabr entered "a restricted building and grounds, that is, the White House Complex and United States Treasury Building and Grounds." <u>See</u> Information.  The government makes two related arguments that

---

       [7]     No evidence has been presented that the President or other protectee was "temporarily visiting" the United States Treasury Building or its grounds.  Nor was there a special event of national significance there on the day in question.  Thus, subsections 1752(c)(1)(B) and (C) are inapplicable to the instant analysis, and the Court focuses solely on whether Ms. Jabr entered a "restricted building or ground," defined as a "posted, cordoned off, or otherwise restricted area . . . of the White House or its grounds." <u>See</u> 18 U.S.C. § 1752(c)(1)(A).

the area Ms. Jabr entered constituted a "restricted building or grounds" under the terms of the statute. <u>See</u> 18 U.S.C. § 1752(c)(1)(A). First, the government argues that the U.S. Treasury Building and its grounds are part of the White House grounds. <u>See</u> Trans. 1 at 22. Second, the government argues that the U.S. Treasury Building and its grounds are "restricted" under the terms of the statute because they are part of the continuous restricted area surrounding the White House grounds and protected by Secret Service. <u>See</u> Opp. at 7-8. The Court cannot agree with either submission.

Whether the U.S. Treasury Building and its grounds qualify as a "restricted building or grounds" under Section 1752 is a matter of statutory interpretation – a question of law for the Court to decide. To approach this question, the Court first considers the statutory language: "[The Court] must first 'determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case.' If it does, [its] inquiry ends and [it applies] the statute's plain language. But if [the Court] find[s] the statutory language ambiguous, [it] look[s] beyond the text for other indicia of congressional intent," <u>see</u> <u>United States v. Villanueva-Sotelo</u>, 515 F.3d 1234, 1237 (D.C. Cir. 2008), including other portions of the statute, the textual context, congressional purpose, and the statute's legislative history. <u>See</u> <u>id.</u> at 1243; <u>see also</u> <u>Liparota v. United States</u>, 471 U.S. 419, 424 (1985) ("The definition of the elements of a criminal offense is entrusted to the legislature, particularly in the case of federal crimes, which are solely creatures of statute.").

With respect to the government's first argument, the Court concludes that the statutory language is clear and unambiguous. Congress explicitly defined the "restricted area or grounds" as the "White House or its grounds" – terms that are clear on their face. <u>See</u> 18 U.S.C. § 1752(c)(1)(A). Section 1752 does not explicitly include the U.S. Treasury Building or its

grounds in the definition of a restricted area.  Nor does it include the term "White House Complex," as the information does.

The Court finds no indication that Congress intended to depart from the plain meaning of the statute to read "White House grounds" as actually referring to or including the U.S. Treasury Building and its grounds.  Ms. Jabr cites to two other statutes, arguing that they should inform the Court's interpretation of Section 1752 because they use similar language.  See Def. Mot. at 4-6.  "Where Congress uses the same term in the same way in two statutes with closely related goals, basic canons of statutory construction suggest a presumption that Congress intended the term to have the same meaning in both contexts."  See New Hampshire v. Ramsey, 366 F.3d 1, 26 (1st Cir. 2004) (citing Sullivan v. Stroop, 496 U.S. 478, 484 (1990)).  Ms. Jabr first cites Public Law 87-286, which designated the White House to be administered by the National Park Service.  In that statute, Congress provided that the "White House" was comprised of "eighteen and seven one-hundredths acres."  See Act Concerning the White House and Providing for the Care and Preservation of its Historic and Artistic Contents, Pub. L. No. 87-287, 75 Stat. 586 (1961).  It would follow that the "White House or its grounds" in Section 1752 refers to the same contained eighteen-acre area.  The government's evidence itself showed that the "White House grounds" refers to an eighteen-acre area.  See Trans. 1 at 31 (testimony of Sergeant Delcoco).

The other statute cited by Ms. Jabr demonstrates that Congress considered the White House grounds and the U.S. Treasury Building to be two distinct entities.  Section 8100 of the 1997 Omnibus Consolidated Appropriations Act – related to telecommunications support to the Secret Service – provided that "the White House Security Complex" includes "the White House, the White House grounds, the Old Executive Office Building, the New Executive Office

Building, the Blair House, the Treasury Building, and the Vice President's Residence at the

Naval Observatory." See Pub. L. No. 104-208, § 8100, 110 Stat. 3009 (1996).  In that statute,

Congress differentiated between the "White House," the "White House grounds," and the

"Treasury Building."  It follows then that Congress intended the term "White House or its

grounds" in Section 1752 to be read according to its plain meaning.  The U.S. Treasury Building

and its grounds, therefore, are not included in the eighteen acres of the White House and its

grounds.

At trial, the government did not prove that Ms. Jabr entered the White House or

its grounds.  Instead, the government presented evidence that Ms. Jabr entered the White House

Complex – a larger area that includes the White House grounds.  See Trans. 1 at 31.[8]  As the

1997 Omnibus Consolidated Appropriations Act indicates, the White House and its grounds are

---

[8]       The government also submitted a declaration by James Murray, Assistant Director
of the United States Secret Service, as an attachment to its opposition [Dkt. No. 26] to Ms. Jabr's
motion in order to demonstrate that "the United States Secret Service views the White House and
its grounds as encompassing the White House, the Treasury Building, and the Eisenhower
Executive Office Building." See Opp. at 10; Declaration of James Murray [Dkt. No. 26-2].  Ms.
Jabr's motion, however, must be resolved based on the sufficiency of evidence presented by the
government at trial, and Mr. Murray's declaration was filed after the government rested its case.
See United States v. Kayode, 254 F.3d at 212.  The government cannot bolster its case through
such a testimonial affidavit, not subject to cross-examination, without depriving Ms. Jabr of her
rights under the Confrontation Clause.  The Court therefore will not consider Mr. Murray's
declaration in deciding the instant motion or when weighing the evidence to determine Ms.
Jabr's guilt.

Even if it could consider Mr. Murray's declaration, the Secret Service's interpretation is
wholly irrelevant to the Court's determination of Congress' intent in enacting Section 1752.  See
United States v. Villanueva-Sotelo, 515 F.3d at 1237.  For the same reasons, the Court is not
persuaded by Ms. Jabr's references to the National Park Service's interpretation of what
constitutes the "White House grounds," because that is not necessarily indicative of Congress'
intent either.  See Mot. at 5.

not equivalent to the White House Complex.[9]  This distinction is consistent with the government

witness' own testimony:   "The White House grounds[] would be more of the 18 acres of the

White House itself, but the White House complex would include all of it."  See id. at 31

(testimony of Sergeant Delcoco).  Section 1752 does not criminalize entry into the White House

Complex.  Only a subsection of the White House Complex – the White House and its grounds

– is restricted under the terms of the statute.  Thus, proof that Ms. Jabr entered the White House

Complex is insufficient to satisfy the second element of the statute.

        The government's second argument is that the statute should be read broadly to

encompass the area surrounding the White House or its grounds.  See Opp. at 7-8; Trans. Mot. H.

at 19-20.  As stated, Section 1752 prohibits entry into "restricted buildings or grounds," and as

relevant here, "restricted buildings or grounds" refers to "any posted, cordoned off, or otherwise

restricted area . . . of the White House or its grounds."  See 18 U.S.C. § 1752(c)(1)(A).  The

government points to the word "area" and the modifying language of "posted, cordoned off, or

otherwise restricted buildings or grounds" to refer to an area larger than the White House

grounds.  It maintains that this area necessarily includes the U.S. Treasury Building because it is

within the "restricted area," "marked by a continuous fence line, . . . features signs indicating that

access is restricted, and is protected by officers of the United States Secret Service."  See Opp. at

8; see also Trans. Mot. H. at 13-20, 34-37.  Ms. Jabr, on the other hand, would have the Court

---

[9]     Sergeant Delcoco testified that the "White House [C]omplex" includes "the White House grounds itself, the Treasury Building, the new Executive Office Building, the old Executive Office Building, all those that make up the White House [C]omplex."  See Trans. 1 at 30.  The "White House [C]omplex" is the area bounded by "15th Street on the east, 17th Street on the west, E Street on the south, and Pennsylvania Avenue on the north," which would encompass "the 18 acres of the White House grounds," as well as the U.S. Treasury Building grounds.  See id. at 31.

read the same language according to its common usage as referring to <u>an area of</u> the White House or its grounds – that is, a part of the White House grounds. <u>See</u> Trans. Mot. H. at 24. She points specifically to the words "area of" as signifying that Congress intended the "posted, cordoned off, or otherwise restricted area" to be a subsection of the White House or its grounds, but not an area greater than the White House and its grounds. <u>See</u> <u>id.</u> at 24-25.

Again, this is a question of statutory interpretation for the Court.[10]  While the word "of" has a common meaning, as Ms. Jabr suggests, it is more useful here to look to legislative history of Section 1752, which provides some clarity as to Congress' intent in using the terms "posted, cordoned off, or otherwise restricted area of."  Section 1752 was amended in 2012 by the Federal Restricted Buildings and Grounds Improvement Act of 2011 – known as H.R. 347 – to make the disputed language a modifier for three separate subsections. <u>See</u> Pub. L. No. 112-98, 126 Stat. 263 (2012) ("H.R. 347").  Prior to the passage of H.R. 347, Section 1752 contained no separate definitional section.  Rather, it prohibited, in relevant part, any person from (1) willfully and knowingly entering or remaining in any posted, cordoned off, or otherwise restricted area of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting, and (2) willfully and knowingly entering or remaining in any posted, cordoned off, or otherwise restricted area of a building or grounds so restricted with an event designated as a special event of national significance. <u>See</u> 18 U.S.C. § 1752(a)(1), (2) (2006), <u>amended</u> <u>by</u> Pub. L. 112-98, 126 Stat. 263 (2012).

H.R. 347 made two amendments relevant to the Court's current analysis:  First, H.R. 347 provided a blanket prohibition on "knowingly enter[ing] or remain[ing] in any

---

[10]      And, again, the opinions of the officers or even the high officials of the Secret Service are irrelevant to the Court's interpretation of the statute. <u>See</u> <u>supra</u> note 6.

restricted building or grounds without lawful authority to do so." See H.R. 347.[11]  Second, H.R.

347 [1] removed the definitions of "restricted buildings or grounds" previously included in the

provisions defining criminalized behavior and moved them to a separate definitional section

– subsection (c)(1); and [2] it added the "White House or its grounds, or the Vice President's

official residence or its grounds" to the areas expressly restricted by Section 1752 as subsection

(c)(1)(A).  See id.  In effect, the H.R. 347 amendments codified – and the statute now defines

– "restricted buildings or grounds" as "any posted, cordoned off, or otherwise restricted area"

"(A) of the White House or its grounds, or the Vice President's official residence or its grounds;

(B) of a building or grounds where the President or other person protected by the Secret Service

is or will be temporarily visiting; or (C) of a building or grounds so restricted in conjunction with

an event designated as a special event of national significance."  See id.; 18 U.S.C.

§ 1752(c)(1)(A)-(C).

       Looking at the amended version of Section 1752, the government argues that the

two other definitions of "restricted buildings or grounds" – subsections (c)(1)(B) and (C)

– "envision that the United States Secret Services will exercise its discretion to determine the

scope of the restricted area necessary to protect the President.  It would be incongruous to read

Section (c)(1)(A) to the contrary."  See Opp. at 9.[12]  The Court could not disagree more strongly.

---

[11]     Section 1752 was further amended in 2018 to add a fifth category of criminalized
activity: "(5) knowingly and willfully operat[ing] an unmanned aircraft system with the intent to
knowingly and willfully direct or otherwise cause such unmanned aircraft system to enter or
operate within or above a restricted building or grounds." See FAA Authorization Act of 2018,
Pub. L. No. 115-254, § 381, 132 Stat. 3186.  This additional language was added after Ms. Jabr's
trial and is not relevant to the instant case.

[12]     Even if parts (c)(1)(B) and (C) provide some discretion, it is limited.  The areas
restricted under (c)(1)(B) and (c)(1)(C) are:  a place where the President or other person
protected by the Secret Service is "temporarily visiting" or grounds restricted in connection with
a "special event of national significance."  See 18 U.S.C. § 1752(c)(1)(B), (C).

As the accompanying House Judiciary Committee Report explains, the amendments added by

H.R. 347 were intended to expand federal jurisdiction, but in a finite way. See H.R. REP. NO.

112-9, at 2-3 (2011), reprinted in 2012 U.S.C.C.A.N. 263, 264-65 ("House Committee on the

Judiciary Report"). Prior to the 2012 amendments, the "law prohibit[ed] unlawful entries upon

any restricted building or ground where the President, Vice President or other protectee is

temporarily visiting," but the Secret Service was required to rely upon the misdemeanor

provisions of the D.C. Code to prosecute someone who trespassed or attempted to trespass on the

grounds of the White House or the Vice President's residence. See id. at 2. The House Judiciary

Committee Report explained that the 2012 amendments "remedie[d] this problem by specifically

including the White House, the Vice President's residence, and their respective grounds in the

definition of restricted buildings and grounds for purposes of Section 1752." See id.

Congressman Johnson of Georgia – a supporter of H.R. 347 – explained that the revisions

"would add the White House and the Vice President's residence to the definition of restricted

areas protected under current law." See 157 CONG. REC. H1372-01 (daily ed. Feb. 28, 2011)

(statement of Rep. Johnson). Congress' amendment, therefore, was discrete and specific to this

gap in federal jurisdiction. Thus, while subsections (c)(1)(B) and (C) may anticipate and require

the Secret Service to exercise discretion, the same cannot be said for subsection (c)(1)(A), which

was precisely defined. The Court concludes that the expansion of federal jurisdiction under

Section 1752 would not extend an ambiguous perimeter around the White House to include the

U.S. Treasury Building.

        The government also argues that by conditioning the pertinent area of the White

House or its grounds as the area which is "posted, cordoned off, or otherwise restricted,"

Congress could not have intended to mean just the "White House or its grounds" – it must mean

a larger area – "or there would be no reason why Congress included the additional language."
See Opp. at 8. The Court disagrees. It finds that the addition of the terms "posted, cordoned off,
or otherwise restricted" as conditioning "White House or its grounds" to be an unremarkable
decision driven by the objective of clarity. Congress was expressly motivated to simplify
Section 1752 in legislating the 2012 amendments (H.R. 347). See House Committee on the
Judiciary Report at 1. As discussed, H.R. 347 moved the definition of "restricted building or
grounds" to a separate subsection – subsection (c)(1) – and added the White House and the Vice
President's House and their grounds as subsection (c)(1)(A) – a third type of "restricted building
or ground." In structuring the definitional section, instead of restating the qualification "any
posted, cordoned off, or otherwise restricted area" – which was already included in the definition
of (B) and (C) – it appears that Congress chose to qualify all three.

　　　　As discussed, the White House and its grounds refers to a defined area –
specifically, eighteen acres. The "restricted area" of the White House or its grounds could refer
to all eighteen acres, surrounded by a fence, or to a subsection of the White House grounds,
further restricted. What is significant for the current discussion is that the "White House and its
grounds" refers to a finite part of the "White House complex," and Congress deliberately
referred to the "White House grounds," not the "White House Complex," in Section 1752. To
read the surrounding text as referring to a larger geographic area would be contrary to that
legislative choice and the statutory language.

　　　　Finally, the government argues that reading Section 1752 to exclude the Treasury
Building would "subvert the purpose of the statute." See Opp. at 10. The government points to
a statement by Congressman Rooney of Florida – the author of the 2012 revisions – in which he
explained that "H.R. 347 [is intended to] ensure[] that the Secret Service has the ability to secure

<u>all necessary areas surrounding restricted buildings and grounds</u> that house our leaders, their

families, and foreign heads of state."  <u>See</u> <u>id.</u> at 8-9 (emphasis in document) (quoting 157 CONG.

REC. H1372-01 (daily ed. Feb. 28, 2011) (statement of Rep. Rooney)).  Contrary to the

government's argument, however, reading the text of the statute to extend federal jurisdiction to

the White House, the Vice President's official residence, and their grounds – and not a wider

area – would effectuate Congress' explicit intent.

       The Court concludes that on the evidence presented at Ms. Jabr's trial, no rational

trier of fact could find the second element of the statute met beyond a reasonable doubt –

because it concludes, as a matter of law, that the U.S. Treasury Building or its grounds are not a

"restricted building[] or grounds" under the terms of Section 1752(c)(1)(A).  Thus, the Court

grants judgement of acquittal for Ms. Jabr on the primary charge of entering or remaining in a

restricted building or ground under the terms of Section 1752.


       2. The Third Element of Section 1752(a)(1)

       Separately, Ms. Jabr also contends that the government has not met its burden

with respect to the third element of Section 1752.  <u>See</u> Def. Mot. at 6; Reply at 5-6.  In full,

Section 1752 criminalizes anyone who "[1] knowingly enters or remains in [2] any restricted

building or grounds [3] without lawful authority to do so."  <u>See</u> 18 U.S.C. § 1752(a)(1).  The

term "without lawful authority" limits the scope of Section 1752, criminalizing the actions of

only those without lawful authority to enter restricted areas or buildings, and avoids

criminalizing the conduct of those who have such authority – such as Secret Service agents, other

authorized official personnel, or members of the public with requisite permission.  <u>See</u> 157

CONG. REC. H1372-01 (daily ed. Feb. 28, 2011) (statement of Rep. Rooney).

The government argues that it provided sufficient proof during trial that Ms. Jabr was "without lawful authority to enter," because she admitted in her post-arrest interview that she "knew nobody was supposed to go up there," and because, at the time of her alleged trespass, she "made efforts to evade law enforcement detection." See Opp. at 10-11; Trans. Mot. H. at 12-13, 20. Ms. Jabr maintains that the question is not whether the government presented sufficient evidence that Ms. Jabr knew she did not have the right to be where she was, but whether the government presented sufficient evidence that she, in fact, did not have the legal authority. See Trans. 2 at 19-20. She argues that she had no personal knowledge of whether she had lawful authority, that the government did not prove that she did, and that the government therefore failed to prove this element of the offense. See Trans. Mot. H. at 26. Ms. Jabr contends that "by relying on [her] statement, the government effectively admits that it presented no such evidence from its witnesses." See Reply at 5. The Court need not decide who has the better of this argument. Even if the government is correct on this issue, as just discussed the government has failed to meet its burden of proving the second element of the offense – that Ms. Jabr entered and remained in the "restricted buildings or grounds" governed by the federal statute. See 18 U.S.C. § 1752. Ms. Jabr therefore is entitled to judgment of acquittal on the substantive charge of violating 18 U.S.C. § 1752(a)(1).

*C. Sufficiency of the Evidence to Prove Attempt to Violate Section 1752: Did Ms. Jabr Attempt to Enter a Restricted Building or Grounds?*

As an alternative, the government argues that even if Ms. Jabr cannot be found guilty of entering restricted grounds, she is guilty of an attempt to enter a restricted building or ground under 18 U.S.C. 1752(a), and the evidence fully supports a conviction for attempt beyond a reasonable doubt. See Opp. at 4-7. Section 1752 explicitly prohibits any attempt to trespass on

the White House or its grounds.  Specifically, it prohibits "knowingly enter[ing] or remain[ing] in any restricted building or grounds without lawful authority to do so" or "attempt[ing] or conspir[ing] to do so."  See 18 U.S.C. § 1752(a)(1).  The government maintains that "there is clearly no reasonable doubt that this defendant was attempting to get to the White House, not just to the White House complex but to talk to Trump at the White House," and that she took substantial steps towards achieving that objective.  See Trans. Mot. H. at 22-23; Opp. at 26.   Ms. Jabr, by contrast, contends that "attempting to enter the White House security complex is not a federal crime."  See Trans. Mot. H. at 23.  Furthermore, she says, there was no attempt to enter a restricted area because she did not take a substantial step towards the culmination of the crime of knowingly entering a restricted area.  See Reply at 5.  The question for the Court therefore is whether the testimony at trial was sufficient to satisfy the elements of an attempt to violate Section 1752 and to permit the factfinder to consider whether attempt has been proven beyond a reasonable doubt.

### 1. Rule 31(c) of the Federal Rules of Criminal Procedure

As a threshold matter, the Court considers whether Ms. Jabr may be criminally liable for the crime of attempt when "attempt" was omitted from the charging document.  See Information.  It is established that "[a]n indictment must set forth each element of the crime that it charges."  See United States v. Resendiz-Ponce, 549 U.S. 102, 107 (2007) (quoting Almendarez-Torres v. United States, 523 U.S. 224, 228 (1998)).  But "[w]hen ruling on a motion for judgment of acquittal, a district court should consider not only whether the evidence would be sufficient to sustain a conviction of the offense charged, but also whether it would be sufficient to sustain a conviction on a lesser included offense."  See United States v. Wood, 207 F.3d 1222, 1229 (10th Cir. 2000).  And if the evidence is sufficient to support a conviction on the

lesser offense – but not the greater – the Court may submit the lesser charge to the jury for its consideration.  See id.  Here, however, the government has not argued that Ms. Jabr is guilty of a lesser included offense.  Instead, the government contends that Rule 31 of the Federal Rules of Criminal Procedure – "the same rule that talks about lesser included offenses" – allows "a defendant to be found guilty of an attempt to commit the offense charged" even when attempt is not expressly charged.  See Trans. 2 at 9.

Rule 31 of the Federal Rules of Criminal Procedure provides, in relevant part, that "[a] defendant may be guilty of . . . (1) an offense necessarily included in the offense charged; [or] (2) an attempt to commit the offense charged."  See FED. R. CRIM. P. 31(c).  Courts have generally agreed that "under Fed. R. Crim. P. 31(c), a defendant may be found guilty of an attempt to commit a substantive offense, whether or not the attempt was charged in the indictment, provided an attempt is punishable."  See United States v. Dhinsa, 243 F.3d 635, 675 (2d Cir. 2001) (quoting United States v. Marin, 513 F.2d 974, 976 (2d Cir. 1975)).  See also United States v. Resendiz-Ponce, 549 U.S. at 110 n.7; Littleton v. Carter, 3:14-cv-0371-RDP-JEO, 2016 WL 7972059, at *15 (N.D. Ala. Nov. 28, 2016) ("[I]t is well established under federal law that an indictment charging a completed offense will also support a conviction for attempting to commit the same crime."); 3 CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE & PROCEDURE CRIMINAL § 515 (4th ed. 2019).

An attempt to commit a criminal offense is "actionable only where . . . a specific criminal statute makes impermissible its attempted as well as actual violation."  United States v. Douglas, 525 F.3d 225, 251 (2d Cir. 2008) (quoting United States v. Manley, 632 F.2d 978, 987 (2d Cir. 1980)).  Section 1752 explicitly criminalizes attempt, making the crime of attempt actionable.  See 18 U.S.C. § 1752(a).  The Court therefore concludes that pursuant to Rule 31(c),

it may find Ms. Jabr guilty of attempt to violate Section 1752, even though the information references only the substantive crime.  See Information.

2.  Legal Standard: the Crime of Attempt

Having concluded that the Court may consider whether Ms. Jabr is guilty of the crime of attempt, it must now determine whether the government has presented sufficient evidence to permit a rational trier of fact to find, beyond a reasonable doubt, that her conduct qualifies as an attempt to commit the substantive crime under Section 1752.  In other words, considering the evidence in the light most favorable to the government at this stage, should the Court grant or deny Ms. Jabr's Rule 29 motion for judgement of acquittal on the crime of attempt?  See supra Section III.

No court has written about the elements that must be proven to find a defendant guilty of attempting to violate Section 1752.  The government invokes the Model Penal Code's definition of attempt, which provides, in relevant part, that "[a] person is guilty of an attempt to commit a crime if, acting with the kind of culpability otherwise required for commission of the crime, he:  (a) purposely engages in conduct that would constitute the crime if the attendant circumstances were as he believes them to be; or (b) when causing a particular result is an element of the crime, does or omits to do anything with the purpose of causing or with the belief that it will cause such result without further conduct on his part, or (c) purposely does or omits to do anything that, under the circumstances he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime."  See MODEL PENAL CODE § 5.01(1); see also United States v. Duran, 96 F.3d 1495, 1507-08 (D.C. Cir. 1996).  But while the D.C. Circuit has acknowledged that "most federal courts adhere to the definition of criminal attempt outlined in the Model Penal Code," see United

26

<u>States v. Duran</u>, 96 F.3d at 1507-08, this Circuit generally has applied a common law definition of criminal attempt. <u>See</u> <u>id</u>. at 1507.

Under the common law, the crime of attempt consists of "(1) an intent to do an act or to bring about certain consequences which would in law amount to a crime and (2) an act in furtherance of that intent which . . . goes beyond mere preparation." <u>See</u> <u>United States v. Washington</u>, 106 F.3d 983, 1005 (D.C. Cir. 1997) (quoting 2 WAYNE R. LA FAVE & AUSTIN W. SCOTT, JR., SUBSTANTIVE CRIMINAL LAW 18 (1986)); <u>see</u> <u>also</u> <u>United States v. Nitschke</u>, 843 F. Supp. 2d 4, 9-10 (D.D.C. 2011). As explained by Judge Richey in <u>Duran</u>, the "dual elements" of the crime of attempt are "[1] that the defendant had the specific intent to commit the substantive crime and [2] that he took a substantial step towards commission of the crime." <u>See</u> <u>United States v. Duran</u>, 884 F. Supp. 577, 582 (D.D.C. 1995) (citing <u>Braxton v. United States</u>, 500 U.S. 344, 349 (1991)). And as Judge Boasberg further explained in <u>Nitschke</u>, "[t]he act in furtherance is often described as a 'substantial step' that demonstrates a 'true commitment toward completing the crime' and 'that the crime will take place unless interrupted by independent circumstances.'" <u>United States v. Nitschke</u>, 643 F. Supp. 2d at 10 (quoting <u>United States v. Hofus</u>, 598 F.3d 1171, 1174 (9th Cir. 2010)).

a.  Mental State

The Court first considers whether Ms. Jabr had the requisite mental state – or <u>mens</u> <u>rea</u> – to be convicted of an attempt to violate the statute. "Few areas of criminal law pose more difficulty than the proper definition of <u>mens</u> <u>rea</u> required for any particular crime." <u>See</u> <u>United States v. Bailey</u>, 444 U.S. 394, 403 (1980). At common law, crimes were categorized as

requiring either "general intent" or "specific intent." [13]   The Supreme Court has said that this distinction has been "the source of a good deal of confusion." See United States v. Bailey, 444 at 403.  In the case of a general intent crime, the government need only prove that the "defendant intend[ed] to do the act that the law proscribes.'"  See United States v. Gonyea, 140 F.3d 649, 653 (6th Cir. 1998) (quoting United States v. Phillips, 19 F.3d 1565, 1576-77 (11th Cir. 1994)); see also Carter v. United States, 530 U.S. 255, 268 (2000); United States v. Linares, 367 F.3d 941, 948 (D.C. Cir. 2004) ("[G]eneral intent . . . refers to the knowing commission of an act that the law makes a crime." (quoting United States v. Kleinbart, 27 F.3d 586, 592 n.4 (D.C. Cir. 1994))); United States v. Francis, 164 F.3d 120, 121 (2d Cir. 1999).  By contrast, courts have read "specific intent" as requiring "a defendant to do more than knowingly act in violation of the law.  The defendant must also act with the purpose of violating the law." See United States v. Gonyea, 140 F. 3d at 653 (internal citations omitted); see also United States v. Duran, 884 F. Supp. at 583 (explaining that "specific intent" refers to "the bad purpose of the actor"); Carter v. United States, 530 U.S. at 267-69 (discussing scienter).

    At common law, it was established that the crime of attempt required the government to prove heightened culpability -- specifically, an intent to commit the substantive crime – which courts, including judges in this Circuit, have interpreted as requiring proof of

---

[13]    In response to the ambiguity created by the categorization of crimes as either "general intent" or "specific intent" crimes at common law, the Model Penal Code proposed a "hierarchy of culpable states of mind," which were identified "in descending order of culpability, as purpose, knowledge, recklessness, and negligence."  See United States v. Bailey, 444 U.S. at 403-04 (citing MODEL PENAL CODE § 2.02); see also Dixon v. United States, 548 U.S. 1, 7 (2006).  The Supreme Court has recognized that the mental state of "knowledge" "corresponds loosely with the [common law] concept of general intent," while "purpose," a heightened culpability, "corresponds loosely with the common-law concept of specific intent."  See United States v. Bailey, 444 U.S. at 405; see also, United States v. Childress, 58 F.3d 693, 707 (D.C. Cir. 1995).

"specific intent."  See United States v. Bailey, 444 U.S. at 405; see also United States v.
Resendiz-Ponce, 549 U.S. at 106; Braxton v. United States, 500 U.S. at 351 n.*; United States v.
Duran, 884 F. Supp. at 582-83; United States v. Rodriguez, 416 F.3d 123, 126 (2d Cir. 2005).
"The reason for requiring specific intent for attempt crimes is to resolve the uncertainty whether
the defendant's purpose was indeed to engage in criminal, rather than innocent, conduct."  See
United States v. Gracidas-Ulibarry, 231 F.3d 1188, 1193 (9th Cir. 2000) (en banc); see also
United States v. Bailey, 444 U.S. at 405 (explaining that in attempt, the requirement of
heightened mental state "separates criminality itself from otherwise innocuous behavior").
Neither party has given the Court any reason why it should depart from this common law
approach.  But, of course, the Court would be required to do so – as in every question of
statutory interpretation – if Congress expressed a different intent.  See United States v. Bailey,
444 U.S. at 406; United States v. Gracidas-Ulibarry, 231 F.3d at 1193 ("In determining the level
of mental culpability required for a particular statutory offense, we must first look to the intent of
Congress.").

To glean Congress' intent, the Court again looks to the text and legislative history
of Section 1752, as well as the context in which the attempt language is set.  It is established that
"[w]hen Congress has used a term that has a settled common law meaning, 'a court must infer,
unless the statute otherwise dictates, that Congress means to incorporate the established
meaning' of that term."  See United States v. Gracidas-Ulibarry, 231 F.3d at 1193 (quoting
Neder v. United States, 527 U.S. 1, 21 (1999)).  18 U.S.C. § 1752 is silent as to the mental state
required for the crime of attempt under the statute.  It would follow, then, that the word
"attempt" in Section 1752 would connote the common law definition of attempt – requiring
specific intent.  See United States v. Gracidas-Ulibarry, 231 F.3d at 1192 ("Congress' use of the

term 'attempts' in a criminal statute manifest[s] a requirement of specific intent to commit the crime attempted, even when the statute [does] not contain an explicit intent requirement."); see also Braxton v. United States, 500 U.S. at 351 n.* ("Since the statute does not specify the elements of 'attempt to kill,' they are those required for an 'attempt' at common law . . . ."). And the Court finds no indication in the statutory text or the legislative history that Congress intended to deviate from the common law definition of attempt.

The fact that Congress has expressly required proof of "knowledge" for the substantive crime in Section 1752 does not persuade the Court to deviate from the common law as to the crime of attempt. Proof of "specific intent" under common law "is the basis for the doctrine that the crime of attempt requires a showing of 'specific intent even if the crime attempted does not.'" See United States v. Gracidas-Ulibarry, 231 F.3d at 1192 (quoting United States v. Hadley, 918 F.2d 848, 853 (9th Cir. 1990)). See also 1 WAYNE R. LA FAVE, SUBSTANTIVE CRIMINAL LAW § 5.2(e) (3d ed. 2018) ("[C]riminal attempts require proof of an intent to bring about the consequences set forth in the crime attempted, and this is so even though no such intent is required for the completed crime."). Accordingly, when considering statutes that criminalize the attempt to commit a substantive offense, and the substantive offense requires a mental state of "knowingly" – as 18 U.S.C. § 1752 does here – courts have generally required the government to prove specific intent in order to find the defendant guilty of attempt. See United States v. Muentes, 316 Fed. App'x 921, 923-24 (11th Cir. 2009) (requiring proof of specific intent to find a defendant guilty of attempt when the statute – 18 U.S.C. § 2422(b) – required proof that the defendant acted "knowingly" for the substantive crime); United States v. Sneezer, 900 F.2d 177, 179 (9th Cir. 1990) (same as to 18 U.S.C. § 2242, criminalizing sexual abuse); United States v. Cox, No. 10-CR-20028, 2013 WL 587545, at *2 (C.D. Ill. Feb. 14.

2013) (same as to 18 U.S.C. §§ 1344, 1014, criminalizing bank fraud and making a false

statement for the purpose of influencing a financial institution, respectively); United States v.

Russo, Criminal No. 3:09cr191, 2009 WL 3839299, at *5 (E.D.Va. Nov. 16, 2009) (same as to

18 U.S.C. § 2252A, criminalizing the receipt of child pornography).  But see United States v.

Rodriguez, 416 F.3d at 125 (joining several other circuits in finding that "nothing about the

nature of the offense [of attempted illegal reentry under 8 U.S.C. § 1326(a)] as an 'attempt'

crime, rather than a completed crime, requires proof of specific attempt").[14]

Furthermore, reading "specific intent" into Section 1752 serves the "common law

justification for requiring specific intent for an attempt crime":  to prevent "lawful conduct [from

being] swept within the proscription of the statute."  See United States v. Gracidas-Ulibarry, 231

F.3d at 1194; see also United States v. Bailey, 444 U.S. at 405 (explaining that for the crime of

attempt, "a heightened mental state separates criminality itself from otherwise innocuous

behavior."); United States v. Rodriguez, 416 F.3d at 127-28.  True, defendants who

impermissibly attempt to enter the White House or its grounds are likely to know that they lack

permission to enter, and they would therefore be acting with the purpose of violating the law.

See, e.g., United States v. Caputo, 201 F. Supp. 3d 65, 72 (D.D.C. 2016) ("[E]very . . .

reasonable person who visits the White House perimeter . . . [is] well-aware that authorized entry

---

[14]     The most recent amendments to the statutory language – H.R. 347 – reveal a
congressional decision to lessen the requisite culpability for the substantive crime of unlawful
entry into a restricted area – subsection (a)(1) – from "willfully and knowingly" to simply
"knowingly."  See Pub. L. No. 112-98, 126 Stat. 263 (2012).  By deliberately lessening the
mental state criminalized by Section 1752, it could follow that Congress intended to extend that
same choice to the crime of attempt under the statute.  But not necessarily.  The statutory text
that remains after the removal of "willfully" counsels the Court against reaching that conclusion.
In removing "willfully" from Section 1752(a)(1), Congress added "without lawful authority to
do so."  The behavior criminalized by the other subsections of Section 1752(a) likewise require
proof of criminal intent – suggesting that Congress did not intend to lessen the culpability
required.  See 18 U.S.C. § 1752(a)(2)-(5).

onto the grounds [is] illegal."). But Section 1752(a)(1) also criminalizes unauthorized entry into areas other than the White House or the Vice President's residence, which are not necessarily "demarcated by an imposing fence and manned by scores of Secret Service agents, unambiguously provides ordinary people with fair notice that unauthorized entry onto the grounds is unlawful." See id. at 72. The buildings or grounds that are restricted under the terms of the statute also include "a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting[] or . . . a building or grounds so restricted in conjunction with an event   . . . of national significance." See 18 U.S.C. § 1752(c)(1)(B), (C). It is possible that a defendant could attempt to enter into an area so restricted without any criminal motivation. Requiring proof that the defendant had specific intent – that is, the purpose of violating the law – helps to avoid punishing innocuous behavior.

Having concluded that an attempt to violate 18 U.S.C. § 1752(a)(1) requires proof of the specific intent to knowingly enter or remain in any restricted building or grounds without lawful authority to do so, the question is whether, drawing all reasonable inferences in the government's favor at this stage, the government has provided sufficient evidence for a reasonable factfinder to conclude that Ms. Jabr had the specific intent to enter or remain in a restricted area. Ms. Jabr argues that the statements she made in her post-arrest interview demonstrated that she wanted to talk to President Trump, but they did not show that she intended to enter or remain in a restricted area of the White House grounds. See Reply at 5. The Court disagrees. It finds that a reasonable factfinder could find, beyond a reasonable doubt, that Ms. Jabr's statements evidence her intention to enter or remain in that restricted area. Ms. Jabr stated in her post-arrest interview that she not only wanted to speak with President Trump, but that she traveled to the White House in order to do so: "I'm like I gotta talk to Trump right now, like let

him know what's going on.  So I run to the White House."  See Interview 1 at 30:02-30:15;
31:20-31:40.  And it can be inferred from her post-arrest interview that she thought that the area
that she was entering – the U.S. Treasury Building grounds – was, in fact, the White House
grounds.  See id. at 30:02-30:15; Interview 2 at 1:17-1:50.

   The fact that Ms. Jabr mistook the U.S. Treasury Building for the White House
– and never actually entered into the White House grounds, an area restricted by the statute – is
of no moment.  Courts have repeatedly declined to recognize factual impossibility as a defense.
See United States v. Washington, 106 F.3d at 1005 (citing United States v. Duran, 884 F. Supp.
at 580 n.5).  As the Supreme Court has stated, the "impossibility of completing the crime
because the facts were not as the defendant believed is not a defense."  United States v.
Williams, 553 U.S. 285, 300 (2008).  See also United States v. Duran, 884 F. Supp. at 582.  "The
court looks instead to the question of whether, if the facts had been as the [defendant] believed
them to be," the defendant's conduct would have amounted to the intended crime.  See United
States v. Washington, 106 F.3d at 1005.  In United States v. Duran, the D.C. Circuit affirmed the
conviction of Mr. Duran for attempting to assassinate President Clinton.  See United States v.
Duran, 96 F.3d at 1507-09.  Duran was prosecuted under a statute that criminalized any attempt
to kill the President, but he never shot at the President.  See id.  Instead, he shot at another man,
mistaking him for the President.  His factual mistake was no defense.  See id.  Just as in Duran,
but for her mistake, Ms. Jabr would have completed the crime.  She verbalized her intent to go to
the White House and explained that she mistook the U.S. Treasury Building for the White

House.  The fact that she only got as far as the U.S. Treasury Building grounds does not negate her culpability.[15]

### b.  Substantial Step

Finding that Ms. Jabr had the requisite mental state, the Court next considers whether she took a "substantial step" or steps toward the commission of the crime.  See United States v. Washington, 106 F.3d at 1005; see also United States v. Nitschke, 843 F. Supp. 2d at 9-10; United States v. Duran, 96 F.3d at 1507-08.  Because neither mere thoughts nor mere preparation (without more) are criminalized, the Court must identify an overt act that is "more than mere preparation, yet may be less than the last act necessary before the actual commission of the substantive crime."  See United States v. Farhane, 634 F.3d 127, 146-47 (2d Cir. 2011) (quoting United States v. Manley, 632 F.2d at 987); see also MODEL PENAL CODE § 2.01.  "A substantial step is one that manifests 'a true commitment toward completing the crime' and 'demonstrat[es] that the crime will take place unless interrupted by independent circumstances.'"  See United States v. Nitschke, 843 F. Supp. 2d at 10 (quoting United States v. Hofus, 598 F.3d 1171, 1174 (9th Cir. 2010)); see also United States v. Bailey, 228 F.3d 637, 640 (6th Cir. 2000).  It is "an appreciable fragment of a crime and an action of such substantiality that, unless

---

[15]    By contrast, the D.C. Circuit has recognized the defense of legal impossibility.  See In re Sealed Case, 223 F.3d 775, 779 (D.C. Cir. 2000) ("'Pure legal impossibility is always a defense.  For example, a hunter cannot be convicted of attempting to shoot a deer if the law does not prohibit shooting deer in the first place.'" (quoting United States v. Hsu, 155 F.3d 189, 199 n.16 (3d Cir. 1998))).  As Ms. Jabr argues, "[y]ou cannot attempt to do something that is not a federal crime."  See Trans. Mot. H. at 29.  But that defense does not save Ms. Jabr, either.  "Legal impossibility is said to occur where the intended acts, even if completed, would not amount to a crime."  See United States v. Berrigan, 482 F.2d 171, 188 (3rd Cir. 1973); see also United States v. Frazier, 560 F.2d 884, 888 (8th Cir. 1977), cert. denied, 435 U.S. 968 (1978).  Here, if the U.S. Treasury Building had been the White House – as Ms. Jabr thought it was – Ms. Jabr would have trespassed in a qualifying restricted area.  Thus, neither of these defenses – factual or legal impossibility – change the Court's conclusion.

frustrated, the crime would have occurred.  The step must be strongly corroborative of the firmness of the defendant's criminal intent and must unequivocally mark the defendant's acts as criminal."  United States v. Ramirez, 348 F.3d 1175, 1180 (10th Cir. 2003) (quoting United States v. Smith, 264 F.3d 1012, 1016 (10th Cir. 2001)).

The Court finds that a reasonable factfinder could find that Ms. Jabr took a substantial step or steps toward the culmination of the crime.  She parked her car near the White House and crossed the fenced perimeter of the White House complex.  See Sec. 1070; Sec. 1710. She ran across the southeast courtyard of the U.S. Treasury Building, ducking from the cameras, and hopped another fence.  See Sec. 1058; Sec. 1709.  Even if Ms. Jabr posed no security threat to the White House or its residents, her conduct plainly evidences acts in furtherance of her intent to enter the White House grounds and constitute more than "mere preparation."  See United States v. Farhane, 634 F.3d at 147 (quoting United States v. Manley, 632 F.2d at 987).

The Court concludes that the government presented sufficient evidence such that a rational factfinder could find beyond a reasonable doubt that all elements of the crime of attempt to violate Section 1752 have been met.  Accordingly, it must deny Ms. Jabr's motion for judgment of acquittal as to attempt.

### D.  Judgment as to Ms. Jabr's Guilt

Having decided that Ms. Jabr's Rule 29 motion must be denied as it relates to the crime of attempt, the Court transitions to its role as factfinder.  In weighing all the evidence presented at trial, the Court finds beyond a reasonable doubt that Ms. Jabr is guilty of attempting to violate Section 1752(a)(1).  It is clear that while she intended to speak with President Trump, Ms. Jabr never set foot in the White House or on its grounds.  The Court has concluded that the U.S. Treasury Building and its grounds are not equivalent to the "White House or its grounds,"

nor is it part of the "restricted area" of the "White House or its grounds" for purposes of this statute. Thus, it concludes that Ms. Jabr cannot be found guilty of entering or remaining in a "restricted building[] or ground" under Section 1752. But, as discussed, factual impossibility is no defense to the crime of attempting to enter a restricted area under 18 U.S.C. § 1752(a). If the circumstances had been what Ms. Jabr perceived them to be, her conduct would have qualified as a violation of the underlying substantive crime. Ms. Jabr verbalized her intent to reach the White House to speak with President Trump. And her actions exemplified her criminal intent to "enter[] or remain[] in [a] restricted building or ground without lawful authority to do so." See 18 U.S.C. § 1752(a)(1). The Court therefore finds Ms. Jabr guilty of the misdemeanor of attempt under Section 1752(a)(1) beyond a reasonable doubt.

## V. CONCLUSION

For reasons set forth in this opinion, the Court will grant Ms. Jabr's motion under Rule 29 for judgment of acquittal as to the substantive offense of entering a restricted building or grounds under 18 U.S.C. 1752(a)(1), but deny her motion as to the crime of attempting to do so. Further, the Court finds Ms. Jabr guilty beyond a reasonable doubt of attempting to violate Section 1752(a)(1). An order consistent with this opinion shall issue this same day.

PAUL L. FRIEDMAN
United States District Judge

DATE: 5|16|19